The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this honorable court may give their attendance and they shall be heard. God save the United States of America and this honorable court. Court is in session. Today's cases will be called as previously announced and the time will be as allotted to counsel. The first case today is Rene Pinto Lugo et al. v. Financial Oversight and Management Board et al. Appeal number 191181. Mark Elliott et al. v. Financial Oversight and Management Board et al. Appeal number 191182. And Peter C. Hine v. Financial Oversight and Management Board et al. Appeal number 191960. Good afternoon, counsel. Mr. Maldonado Nieves, you may proceed when you're ready. Yes, may I please record? First of all, good afternoon to everybody and I hope you're all safe and secure. My name is Roberto Maldonado Nieves and I'm appearing as the attorney of the appellant in case 19-1181. This appeal does not pertain to a set of creditors in a bankruptcy case who are complaining about the substantive terms of an adjustment plan, in this case the COFINA plan, because the plan violates any proprietary rights that they may have as creditors. This is an appeal about the constitutionality and legality of the process pursuant to which an amendment required by the adjustment plan of the COFINA statute in the legislature of Puerto Rico was proceeded with, because we believe that it was undertaken in violation of the due process and the freedom of expression rights of the petitioner. None of the underlying facts of what went on in the legislature have been disputed by the appellees, and I want to go over them because it's very, very important to focus on certain of them. First of all, the adjustment plan required, as a condition proceeding, the approval of a new bond legislation by the House of Representatives and the Senate of Puerto Rico. That was a condition proceeding not only for the adjustment plan to be undertaken by the parties, but also for the district court to consider it and to approve it. To the extent it required that new bond legislation, the Financial Oversight Board is recognizing that the approval of that statute has to be undertaken pursuant to the constitution of Puerto Rico, the laws of Puerto Rico, and the rules of regulation applicable to the process, in particular to those of the House of Representatives. In fact, the Financial Oversight Board admitted so in the notice of removal when they removed the action filed by the petitioners in the Superior Court of Puerto Rico, San Juan Park, challenging the COFINA statute and challenging that amendment. And that notice of removal is part of the addendum of our appeal brief at page 105. Did the rules of the chamber that you say were violated, did they specify what the remedy is in the case of a breach of the rules? They do not specify the remedy. And the option that the legislature, whose rights were violated in that respect, is basically to set the record straight as far as the violation that had been undertaken. And the appellant, Manuel Natal, did so in the record when the amendment was being voted. And the other option that the legislature has is to basically go to a Superior Court in Puerto Rico and challenge the validity of the approval of the statute, which that's what my client did in the Superior Court of Puerto Rico, San Juan Park. And that's what the case is all about. So why would a court be the one who would pick what the remedy is and pick the extreme remedy of throwing out the whole legislation? Because the rules do not provide for that. And to the extent the violation is a violation of the constitutional rights of one of the members of the Legislative Assembly, the only option that he has is to seek the remedy of a court of law as part of the checks and balances in the Republican form of government that the Puerto Rico Constitution has. And the only option that Natal had in that respect was basically to go to court as part of a case in controversy pursuant to the constitutional right that he had to do so. Otherwise, what happened in this case was that the House approved the statute in violation of his rights, the statute as approved by the House was referred to the Senate that approved it the day after, and the statute was submitted to the governor for the governor's approval, and the governor approved it. And once the act was approved by the governor and became a statute in Puerto Rico, the only option that the petitioners had was basically to challenge the validity and legality of that action in the courts of law. Mr. Maldonado, that issue, as well as other constitutional issues that are raised by your complaint, I just read this afternoon again Judge Schwain's decision. She finds that those issues were resolved through mediation. I have several questions on that. First of all, was anyone representing those interests take part in that mediation? Okay, the mediation to which he refers to is to the challenge of the validity of the Coffin Act and its subsequent amendments by the appellant. Well, let me read the opinion. The opinion, and I don't want to take up the time right now. I had it somewhere. It's specific. I think page 76 of the opinion or paragraph 76 of the opinion. I've got it right now. It specifically says that those matters were part of the, yes, here we go. Page 49 of her opinion, she states that those matters were part of the mediation decision. Well, answering your question, in that mediation process, the appellants were not represented. Why? Because they didn't form part of that process, and that process took place, according to my recollection, before the new bond legislation was approved by the legislative assembly of Puerto Rico. And the other issue that was not resolved in the mediation was precisely the way the new bond legislation was approved. That was not part of any mediation in any forum in any way. It's a completely separate and different issue. And, in fact, the district court judge adjudicated that particular claim in footnote number 14 at page 50 of her opinion, in which she just basically said that the challenge of the amendment approved by the legislature of Puerto Rico through the new bond legislation, that challenge was not justifiable. In fact, she quoted two opinions of the Supreme Court of Puerto Rico in support of that opinion, that their claim was not justifiable, that do not stand for what she set forth in the opinion. Those two opinions, which are the cases of Noriega Rodriguez versus Jarabo and Silva versus Hernandez-Agosto, which are on that footnote 14, they stand for the opposite. What page is footnote 14? Can you tell me so I can look at it, please? What? What page is footnote 14 in? It's on page 50, the page immediately after. Okay. All right. Hold it up a minute, because I think there's another issue here that may be of some relevance, and that is your opponent's claim that there's equitable estoppel here involved because of the fact that you didn't ask for a stay, et cetera, et cetera. How do you answer to that? Okay. As far as the stay is concerned, and we bring to the attention of the court what was set forth in our reply, we did ask for a stay. Once the complaint was filed in the Superior Court of Puerto Rico, San Juan Park, within the adjustment plan process. Did you ask for a stay as to the approval of the plan? Yes. That's what I'm trying to explain. We presented an objection, a timely objection in the process before the district court, and when we presented the timely objection, it was presented on January 2, 2019. We brought to the attention of the court the fact that the appellants had filed an action in the Superior Court of Puerto Rico, San Juan Park, and that in that action they were challenging the constitutionality not only of the COFINA statute, but of the new bond legislation, raising the issues that we raised in our appeal. And we requested from the courts to hold in abeyance any decision with respect to the approval of the COFINA plan until the claims of the appellants were duly resolved. Counsel, Mr. Maldonado, I would like a direct answer to Judge Torreya's question. When the district court issued the confirmation order, did you seek a stay or otherwise seek an expedited appeal? After that, we did not seek the stay nor the expedited appeal, but the case law that we looked at set forth that one of the exceptions to not having to file a stay is precisely the possibility that the request for the stay before the district court would be futile. And if the court disregarded our request to hold in abeyance any decision, if the court determined that our claims were non-justiciable, it would have been futile for us to request a stay before the court. And so why did you not seek an expedited appeal or some other process to get a resolution in a timely fashion? Well, we didn't do so. We have to acknowledge the fact that we didn't do so. But the fact that it was not done does not take away the claim that we're making before this court that to the extent the approval of the COFINA adjustment plan was made requiring a condition proceeding that was not duly complied with. It's a plan that has been approved in violation of the Constitution of Puerto Rico, in violation of the DUPROS, and that the COFINA plan cannot stand just because of that, because otherwise the rule of law would not be respected. And it is important in this particular case for the court to take notice that this is not the only case in which other adjustment plans of the bankruptcy of the government of Puerto Rico are going to be having to go through a process in the legislature of Puerto Rico in which the legislature has to approve bond legislation, amendments to the corresponding statutes of any of those adjustment plans. And it is important to consider what happened in this case and to proceed with a precedent that would, as far as the public policy concerns and as far as the rule of law, that would send a signal to the legislature of Puerto Rico to proceed with all of those procedures, comply with the Constitution, and comply with its own rules and regulations, and the law support critical. Counsel, let me stop you there and ask whether the judges have additional questions. Well, I would just like to know if you had an opportunity to, or I should say your client, had an opportunity to take part in the settlement process. Were you notified that it was taking place? I didn't hear you clearly, Judge Torreya. Did your client have an opportunity, because he received, or I should say they received notice, that a settlement process was taking place, some of which was apparently in secret? No, he didn't receive notice of that settlement process. And again, we must set forth clearly that there are two parts in the action filed by my client in court. The attack of the challenge of the Covina statute by itself, but also the challenge of the new bond legislation. And that mediation process took place, according to my recollection, before the new bond legislation was approved. And there was no mediation process regarding the approval of that new bond legislation before the legislature of Puerto Rico. All right, Torreya. I have nothing for you right now. Judge Kayada? No, thank you. All right. Thank you, Mr. Maldonado. Thank you. If you would now mute your audio and your video, please. Yes, I will do so. Thank you. Mr. Hine, please unmute. Audio and video. Can you hear me now? Yes, indeed. Please proceed. Thank you, Your Honor. Peter Hine, appellant in 19-1182 and 19-1960, the appeal by the Covina bondholders. Your Honor, may I reserve three minutes for rebuttal? Yes. There are several subjects that I would like to address. One, the Covina Enabling Act provided by statute that the future sales tax revenues were property of Covina and provided by statute a lien on those future revenues in favor of Covina bondholders. Two, this case is not controlled by Andalusian. Three, under Supreme Court precedents, there was a per se taking and determinations in a confidential mediation cannot constitute proof of just compensation to non-participating, non-consenting bondholders. Four, contrary to the assertions in the Oversight Board's 28-J response, the arguments discussed in our 28-J letter that Aurelius Buttress were raised in our opening brief. But before I go on to those points, I want to respond to the questions that Judge Torea and Judge Howard asked about equitable movements. And there are several points I'd like to make. First, the Covina bondholder appellants are seeking belief that is feasible, that does not require unwinding of any securities transactions, and would not harm innocent third parties. Only the Commonwealth would be affected by giving up a small portion of the money that it improperly took, about the same as the $332 million that was paid to hedge funds and other favored participants in the mediation. Also, other relief that we're seeking, such as vacating the district court's just compensation finding, would likewise not require unwinding any securities transactions. And I'd refer your honors to the Efron case we cited, which makes a point that here, where monetary relief is feasible, a stay is not even available. The requirement of irreparable harm cannot be met under the law that's cited there concerning the requirements for a stay. Also, the Supreme Court's decision in mission product is dispositive. The premise of equitable movements is that the court has discretion not to determine the case on the merits. But what mission product says is that an appeal may be dismissed only if it is impossible for the court to grant any effective relief whatsoever. So the court does not have discretion. Even before mission product, if relief was possible, this court's decisions had repeatedly refused to dismiss on equitable movements grounds, even where the plan or transaction had been consummated, even though no stay had been sought. This is not a case where anyone has put in significant new money. For example, the public service case, there was $1.4 billion of new money from third parties in that case, not here. And then equitable considerations and the Oversight Board's unclean hands away against dismissal. Dismissal would preclude the consideration of constitutional and statutory issues that are going to reoccur as the Oversight Board is intent on using the same mechanism for its next plan. Also, dismissal would embolden the Oversight Board to repeat the tactic of making a deal with hedge funds who bought posts from MISA and are enjoying very large profits to the detriment of individual bondholders who bought their securities long ago. So we submit that equitable movements cannot prevent the court from reaching the merits. And let me turn to the first point concerning the COFINA Enabling Act. Act 18 of 2009 states three times in the first three pages that it provides for creating and perfecting a lien on the revenues of COFINA in favor of its bondholders. Act 18 states this lien on revenues is provided to offer greater protection to bondholders. The statute also provided that future funds are hereby transferred to and shall be the property of COFINA. The Commonwealth, thus by statute, defined the pledged future revenues as property. Mr. Heine, let's assume a thousand different bondholders had a thousand different ideas about what a fair and appropriate way to resolve some of these issues were. How was the court to go about getting that? The court could have, and I respectfully submit should have, decided on the merits. The fundamental legal issues were briefed before it in an adversary proceeding that not the appellants here but another bondholder had been engaged in. And the court could have issued a decision on the merits. Instead, the court opted for this confidential mediation process where there was no notice. What do you mean by the merits? The merits of what? The merits of whether or not the COFINA lien and structure were valid. But suppose some bondholders didn't want to have the merits determination because they feared that it would be determined that those liens were not perfect or were not valid. Suppose they wanted to see a global resolution that split the cake, split the loaf. Your Honor, respectfully, there is, with the lien in place, that cannot be taken away from the bondholders in whose favor it was done. When these bonds were sold, they were sold on the basis that your principal and your interest rate could not be reduced without your consent. And so to take from bondholders who, as the record stands, it's undisputed because there's been no contrary determination that the lien is valid. Indeed, the judge affirmed the validity of essentially the same lien in her opinion with respect to the new bond legislation. So fundamentally here, respectfully, I think the district court had a responsibility to resolve the fundamental legal issue. I think it was an easy issue for her to resolve because, in fact, when she issued her ruling here, she did rule the COFINA lien and structure were valid. And there's no material difference between the old COFINA lien and structure and the new COFINA lien and structure. And in addition to the fact that the Commonwealth law defined the property interest, the COFINA pledge of sales tax revenues to bondholders was stated to be valid and binding as of the time it was made. The statute provided that revenues subsequently received shall be subject to lien immediately without the need for any other act. And the Commonwealth had a non-impairment undertaking here in favor of any person, any person who acquires COFINA bonds, assuring by law that there would be no amendment to the statute to undermine any obligation or commitment to COFINA. That was Puerto Rico law. The Oversight Board asserts in its brief that supposedly we just had an expectancy or unsecured interest, but that is opposite of what the Oversight Board told this court in the Lex Claims Appeal. Three years ago, the Oversight Board told this court that the COFINA bonds were, quote, secured by a statutory lien against pledge revenues. And even this new bond legislation that abrogated the lien acknowledged in the new bond legislation that bondholders currently, meaning under the provisions of the original COFINA Enabling Act, had a lien on COFINA revenues. Mr. Hines, did you participate in the secret settlement discussions? No. Why? Well, I had filed a proof of claim. I was never given any notice of it, never invited to participate, never given any practical means to participate. Likewise, I don't know that I did at the time, Your Honor. It's something where I first got enmeshed in this towards the very end of 2018 when they finally did, after all the deals were cut, they mailed a notice. When did the meetings take place, do you know? I have no idea. All of this, there were repeated orders that this be confidential. In fact, the judge had a standing order regarding separation of mediation and litigation activities that's in the record at JA2-190 in the joint appendix. And the court said in its own order that it would not entertain information regarding events or actions in the mediation process. So the court, having said it's not going to entertain information regarding events or actions in the mediation, then relies on that for a just compensation determination, which, Your Honor, I respectfully submit is not appropriate. It's not appropriate under Rule 408 of the Rules of Evidence that precludes the use of settlement of results, and it's not appropriate under the court's own order. And here, there was no public record at all of this mediation. The court issued repeated orders. Is there a private record, do you know? I have no idea. To my knowledge, nothing in the confirmation process, there was never any production of a private record, and certainly there was no public record. And the court made the assertion in its opinion that, well, there were subordinated bondholders with great interest, but Assured, which was a subordinated bondholder, actually had a 20 times greater interest in the GO bonds. And the GO bonds would benefit to the extent the Covina bonds were haircut. And Assured actually participated in appointing a Commonwealth representative. And, again, we've cited that in the record, JA2-170 to 171 and 2-155. So not only were the participants in this mediation not representative of individual bondholders, but they actually included people on the subordinated bond side, so to speak, in the judge's view, who actually had 20 times more greater interest on the Commonwealth side and actually were involved in appointing the Commonwealth representative. So, basically, our position is that plan confirmation cannot be used to abrogate a lien. The Supreme Court in the Duesnup case says, quote, liens passed through bankruptcy unaffected. That's the U.S. Supreme Court. Under Bankruptcy Rule 7012, if the validity, priority, or extent of a lien is to be affected, an adversary proceeding is required to be brought. So the rules required that each bondholder be sent a notice and an adversary proceeding. The Commonwealth did that in its Title III case more recently, but they did not do that in the Covina case. So Covina bondholders were never given notice of an adversary proceeding, and that is a requirement that itself is fatal. So as things now stand, there is no judicial determination that the lien was invalid, and the revenues, in fact, were adequate to pay all Covina bonds. The senior Covina bondholders financial advisor at the confirmation hearing admitted that if the lien was not released, the Covina senior bondholders, well, what he admitted, and this is the Covina senior bondholder financial advisor, he admitted that if the lien was not released, all bondholders, not just the senior, but also the subordinate, would be paid in full. And Covina itself has admitted that it made, on deposit with the trustee, all post-petition interest payments and was never in payment default. Could you go back to the unwinding issue here? It's what you're saying is that the confirmed plan would remain in place except the release that the Commonwealth got that releases your claims and claims like yours. That's correct, and we have shown, and this is Mr. Elliott's declaration that was submitted in opposition to the motion to dismiss based on equitable mootness, and that the court denied with recognition the merits panel may revisit that issue. But Mr. Elliott's declaration spells out the amounts involved here for the non-consenting bondholders, and if the order is vacated and modified as we have requested, the amounts are basically approximately the same as was paid to the various hedge funds and participants in this confidential mediation. Do we have the authority? I'm assuming this was an attempted to be an integrated, non-severable type deal. They always are. So we would, in effect, be severing out one provision of the plan, which is the release, and yet leaving the rest in place. Is there any authority for our doing that? Sure. 11 U.S.C. 1123 sub A sub 4 provides that people in a class are entitled to equal treatment unless they otherwise consent. So for the 90% that consented, which are basically these large hedge funds and other major investors, the people that consented have agreed to take less. Those who did not consent are entitled to be compensated as we have laid out. And I'd like to just note that there's also an issue that Aurelius Buttress is concerning the fact that the bankruptcy clause has been violated here. The bankruptcy clause requires that laws on the subject of bankruptcies be uniform throughout the United States. Judge Torea, you have a concurrence in the Franklin case, and you were clear there that uniform means unequivocal and unambiguous, like the appointed clause. The Supreme Court didn't see much of my concurrence. Well, they didn't address the issue one way or the other. The Supreme Court did not, either in Franklin or in the Aurelius case, address the bankruptcy clause uniformity issue. And just to show what a sharp point it is in this case, COFINA had all the funds to pay debt service if the lien was not abrogated. COFINA would not have even been allowed to file under Chapter 9 because solvent debtors cannot file under Chapter 9. The Oversight Board has taken the position here that a solvent debtor can file under PROMESA. We dispute that, but that's what's occurred. So we have the spectacle of COFINA, an instrumentality of the Commonwealth, which was set up to secure the bondholders. They did that to give bondholders added security in addition to the Commonwealth's own general obligation pledge. You had bonds that were rated A- in our case. Let's wrap it up. Mr. Hine, let's wrap it up. Your Honor, and just Aurelius also buttresses our contract clause argument. We reference that on page 47 of our opening brief. Otherwise, Your Honor, in light of the time, I'll rely on our brief for other points. And we respectfully request the court order the relief we spelled out in the conclusions of our brief. That's page 72 of our opening brief in 19-1182 and page 42 of the opening brief in 19-1960. If the court has any further questions, I'd be happy to address them. But otherwise, I thank the court for its attention. I have a question. Mr. Hine, how would you be affected by a decision regarding the constitutionality issues that are raised by your co-appellant, not your co-appellant, but the other appellant, the main appellant of this court? If their position ultimately was upheld on the merits, it would impact not just people in terms of old cofina bondholder interests, but their position would actually upset the new cofina bondholders. So it's something where fundamentally that underscores, I think, why the district judge really had a responsibility to determine the fundamental issue of illegality and validity. It should not have been held back after some confidential mediation where she then issues a decision upholding the basic cofina structure. It should have been done at the outset so the property interest would be clear. Thank you. Chief Judge Howard, I do have another question. Yes. Who would, if we were to rule in your favor, who precisely would benefit other than you and the Elliott plaintiffs? Is there a certified unchallenged class in this proceeding? There's no class under 1123A.4. I think it would be appropriate that all non-consenting bondholders receive the benefit of the relief from vacating and modifying the order. And this is something where the broker-dealers… Presumably they took their money. Why would they have rights just because you have asserted your rights differently than they did theirs? Well, there were actually dozens of individual bondholders who put in letters objecting to what was happening. The district judge entered an order that the docket 4441 that just said she wasn't even going to consider that because they weren't served in accordance with their procedures, even though they were docketed. So everyone in the case… Right, right, right. But I'm coming back to it. Judge takes action, approves the plan. The plan has a release of John Doe's claim, in return for which John Doe gets 50% of what his claim might have been. The 30 days runs. John Doe never appeals. He takes the money and goes and spends it. Meanwhile, in the exact same position, Peter Hein says, I don't like that, and I'm appealing. It appeals timely. Why would… If you were entitled to the relief you're seeking for, why would Mr. Doe, who let the final judgment run, be entitled as well? Your Honor, two answers to that. One is, under 11 U.S.C. 1123 sub A sub 4, the creditors in a class, unless they consent, which the people that supported and voted yes did, are entitled to equal treatment with others in their class. That's just saying what their claim is. I'm talking about appellate procedure here. If a judgment is final and someone doesn't file a notice of appeal, they're bound by it. Well, we have standing to challenge the order and judgment as we had. Our relief that we sought is to vacate and modify that order and judgment. And I believe, Your Honor, that you do have authority to vacate and modify that. And frankly, well, you know, it's just as a matter of equity to the individuals here who were not notified of the confidential mediation, not allowed to participate. I respectfully think that the court should entertain that. I believe it's clearly within the court's power because we have standing and we have very much oppressed the issue and sought vacature and modification. All right. Thank you. Thank you very much. Mr. Hine, would you mind muting your audio as well as your video? And Mr. Bienenstock, if you could turn your audio and video on. Thank you, Your Honor. If it's okay with the court, we were going to have Peter Friedman speak first because he's going to address the equitable mootness issue. All right. That's fine. Mr. Friedman. Good afternoon, Your Honor. It's Peter Friedman from Melbourne & Myers. I want to start by addressing the release issue. In paragraph 161 of the court's findings of fact and conclusions of law, the court says, During the course of negotiations regarding the plan and predecessor agreements, it was clear that the debtor's release would be a necessary condition to consummation of the settlement embodied in the plan. In exchange for such releases, the debtor secured the substantial concessions provided by the settlement and the plan. So without the releases, there is no plan left. It doesn't quite work that way, does it? You've got a plan that's in place. If we were to hold the plan did not effectively release Mr. Hines' claims, and so Mr. Hines then asserted claims against the Commonwealth, are you actually saying the Commonwealth would then walk away from the plan? I think the plan would no longer be... Over $100,000? But Mr. Hines' claim is not a solo claim. He just told me he wasn't certified as a plaintiff. He's joined at the hip with the Elliott appellants who claim a $316 million right to payments. Together, those three parties claim a $316 million right to payments. Okay, so the Elliotts have enough bonds, too. That is their own individual, not class-wide damages. That is correct, Your Honor. Okay, well that helps. This is a 1919 settlement, right, that was approved as part of the Commonwealth's plan. Independently in a Commonwealth case and jointly in the COFINA plan. If you take that out, you destroy the plan, because how can the Commonwealth continue to be bound to a settlement where instead of paying X consideration, it faces the possibility of paying X plus $316 million of consideration? Let me stay with that for a second. It's obviously a harder one than the one that I understood when I didn't realize that the non-class individuals actually have $300 million of plans. Let's assume that is, and let's assume we've held that, and therefore the Commonwealth was potentially on the hook to them for $300 million to be negotiated or not. What's their choice at that point? Their choice is walk away from the plan and be stuck with the $300 million? Their transaction costs in getting back to having a plan would end up coming close to that. Your Honor, the court can't order, the district court can't order the payment of $315 million to these parties. The Commonwealth might well conclude that the settlement doesn't work in those circumstances. The court would have to find that that was a fair and reasonable settlement in light of the prospects of litigation between the Commonwealth and COFINA. I think what's missing from the entirety of the presentation by Mr. Hine is that the plan is the result of a settlement of two specific litigations. A litigation between the Commonwealth and COFINA over the validity of the COFINA structure. The court concluded after hearing testimony and declarations and reviewing other evidence and nine months plus of litigation and summary judgment pleadings, that this was a fair settlement of that dispute between the Commonwealth and COFINA. Mr. Hine objected. The court can see from the record the vast majority, the overwhelming majority of COFINA bondholders voted to accept that settlement when they voted to accept the plan. You also had a litigated dispute that was an interpleader that any party can participate in. The whole function of an interpleader is the entire world gets to show up. There was an interpleader litigation between the senior bondholders and the junior bondholders. Mr. Hine, for whatever reason, opted not to participate just as he opted not to participate in the mediation where the court published information at the very beginning of the case that there would be a mediation and who to contact including the email address of the person to contact with respect to the mediation. Those two disputes were settled as part of this Title III plan of adjustment. There's no mechanism to simply say pay $315 million more to one party. You would have to avoid the settlement. When you avoid the settlement, you avoid the entire plan of adjustment because the settlement is a conditioned precedent to the plan of adjustment. That's why I think it's easy to satisfy the component of equitable mootness. There is no effective relief that can be given and you would be destroying a substantially consummated plan. I want to make a few other equitable... Mr. Freeman, before you move on, if we were to find that Elliott's claim appeal is equitably moot but not find that with respect to Hine, would you still stick to your assertion that they're joined at the hip? If you would, then what? I think I would because there's no principle distinction between the two on the other equitable mootness factors. I think, strictly speaking, you would not be able to... The plan would still have to be vacated because the court doesn't have the ability to say to the Commonwealth under the plan structure, you must pay $100,000 more. You're basing that on just the non-severability provision? I'm basing it on the fact that there's an underlying settlement here and the settlement set a fixed amount of compensation that was approved in the Commonwealth case and the COFINA case. But wouldn't we have the ability, regardless of the severability provision and the other promises that were made in reaching the settlement, wouldn't we have the ability in a specific case to decide whether severing that particular claim, given that Mr. Hine did not agree to any of this, is itself severable because it's non-material? Wouldn't we have the ability to do that? I don't think so, Your Honor. I think the whole point of bankruptcy is that classes can bind dissenting members without those dissenting members having the right to come up later on appeal and say, treat me differently. I think that would actually set a terrible precedent of saying that the Bankruptcy Code can't do precisely what it's supposed to do, which is bind members of a voting class. And I think that would actually open the door to terrible mischief where individual creditors in the future could assert, well, I don't like the treatment I'm getting as a member of a class, even though my class bound me. And I think, as Mr. Bienestock will discuss in great detail, that classes can bind people like Mr. Hine. Excuse me, but we're here to approve a plan, which requires us to look into the settlement, are we not? So I think, Your Honor, the settlement was approved. Do we have to check the settlement and not even inquire as to how it was reached? So I think, Your Honor, we can look at the record before the court of evidence of the summary judgment proceedings and the other proceedings in the interpleater and conclude, according to the vast depth, that the judgment was approved. The settlement was reached, and at least one of the major participants, or I won't say major, at least one of the persons who was affected by it, and claims that he was not even notified, couldn't participate in the negotiations, yet you're saying he's bound by it. Your Honor, with due respect, I'm not saying that he's bound by the settlement because it was reached by other parties. What I'm saying is, Mr. Hine, like every other creditor, is bound by the court's conclusion after reviewing the evidence that the settlement was fair and reasonable. And that evidence included multiple declarations about the merits of the Commonwealth COFINA dispute, and two separate litigations that Judge Swain had overseen for years. The interpleater action between senior and junior creditors, and the Commonwealth and COFINA dispute that was litigated between the Commonwealth's agent and COFINA's agent. That was the record before Judge Swain. Judge Swain's reference to the mediation simply reflects that parties who had hundreds of millions, if not billions of dollars at stake, concluded after looking at all of that evidence that it was better to settle than to roll the dice. But Judge Swain still reached specific conclusions that are entitled to substantial deference under the appellate standard for overturning a Rule 9019 settlement in both the Commonwealth case and the COFINA case. Did she decide the constitutional issues that were raised in the complaint? She didn't have to, Your Honor. That's the whole purpose of Bankruptcy Rule 9019. Bankruptcy Rule 9019 and the First Circuit's jurisprudence begs for parties to reach settlements rather than rolling the dice. And the proof that that settlement is a good idea is the overwhelming acceptance of creditors who received nothing more than new bonds. So I think we would be setting a very dangerous precedent to gut Rule 9019, which is the foundation of bankruptcy settlements. Bankruptcy is a collective process under which settlements, as this Court has held many, many, many times, are to be favored. The Supreme Court, I think, the same thing in the TNT Trailer case. This Court, this Judge Swain, who lived with these litigations for years, evaluated the merits and said, for each debtor, is this a fair and reasonable settlement? Is it supported by massive amounts of creditors? Could each side do a lot worse? What Mr. Hine wants you to do is basically say, in every case, everybody has to roll the dice and get 100% or nothing. That's not the way bankruptcy law works, and it's completely inconsistent with First Circuit precedent. Mr. Friedman, could you help me some on a bankruptcy issue? The future stream of revenues is always hung over a lot of these cases because of questions about exactly what it is, can you have a security interest in it, and so on. If we had a model here where we have a debtor that got a house, you've got 10 creditors that all have a security interest in that house, and it's enough, the value of the house is enough to pay off all 10. But then the state comes in and says, I want to take that house, it's really ours. The house owner debtor says, no, it isn't, you can't take it, they have a dispute. The debtor goes into bankruptcy, then everything has to get resolved. The horizontal dispute between the debtor and the state and the debtor as opposed to its creditors. Would the same model be applicable here? Is that how a bankruptcy proceeding in ordinary course would run? Such that a couple of the creditors might want to fight to the end, and yet they couldn't because the court would approve a settlement that would give them each 90 cents on the dollar. That's right, and to be fair, I'll let Mr. Beanstalk address the property issues that you raised and the securitization issues, but yes, I think the whole purpose of bankruptcy is to let classes make determinations on their treatment. And to permit settlements of all sorts of rights. And what's your best case you would point to that the dissenting, in that model I gave you, the dissenting creditors who would have individually rather have fought to the death to get a 0 or 100 result are stuck with taking the 90 because of the vote of the group and the court approving it as fair and reasonable. Your Honor, I guess I struggle to cite a case because that's just an elemental principle of bankruptcy that parties can have. If they're similarly situated, they're bound by class treatment if you get a two-thirds vote in terms of dollar and 50% in members. I may have that backwards. I always get a little confused about numerosity and dollar figures. I think it's two-thirds in dollar figures and 50% numbers. That's what bankruptcy is about. It's a collective proceeding that lets group rights be compromised. I think you better understand, if you're not a bankruptcy lawyer, given his authority, a statement that that's the way it's done in bankruptcy doesn't quite help. Judge, the code, that's what the bankruptcy code provides. It provides for class treatment. And again, Mr. Beeney, and I apologize for stepping in Mr. Beeney's time, I was really meant to address equitable mootness and he can address the class treatment issue. Before you leave, did you participate in these settlement negotiations? I did participate in part of them, yes. I can't hear you, I'm sorry. Afaf, our client, did participate in some of the settlement discussions. Did you? I probably did participate in at least one of them. Is there a record of what took place in these negotiations? I doubt there is a record. I don't think Judge Hauser kept a record. Well, I mean, did you make reports to your clients as to what was being negotiated and why? I'm sure we did. Is anybody arguing today, someone who participated in these negotiations other than apparently the way you did? The oversight, yes. I think all the other parties, the appellees all participated in the mediation. None of the record of what happened at the mediation other than the settlement was reported to Judge Swain, and then Judge Swain independently evaluated whether the merits before her warranted entering an order consistent with the terms of the mediation. Judge Swain did not say there's a mediation, ergo the plan is approved. She looked at the product of the mediation and said, does the evidence in front of me with respect to the two litigations that are being settled justify the settlement? Well, I'd like to know whether the issue of the constitutional matters that had been pending and were discussed and how they were discussed and who represented whom. So, Your Honor, I am precluded by the order of Judge Swain from divulging anything with respect to the contents of the mediation. What I can say is, if you look at the record before Judge Swain, every constitutional issue was briefed for years. There were two parties. Well, they decided it was, I would like to know, by who? Because I haven't been able to find a decision as to these issues. Judge Turway, they weren't decided because each side concluded that it was better to compromise than risk losing everything. Well, the problem with that argument is that they were taking a position as the people that were in those negotiations. So, Your Honor, it's not a position for those not in negotiations. There was an agent appointed on behalf of the COFINA creditors and an agent appointed on behalf of Commonwealth creditors. That was done via a public proceeding. Judge Swain approved those appointments. Each of those sides filed motions, summary judgment motions, after briefing and discovery. Those parties then said, we settle. They proposed their settlement to Judge Swain, who had the benefit of evaluating each side's constitutional arguments. She then concluded that either side could do a lot worse than the settlement after considering the merits of constitutionality of those arguments. She concluded one side could win, the other side might win. Each side would prefer half a loaf to none. There was extensive briefing on the constitutionality. Yeah, but it was never decided. And when one of the parties wanted to certify it to the Supreme Court of Puerto Rico, which I would think would be the best forum to decide what the Constitution of Puerto Rico means, all of you people objected to it. So it didn't happen. That's right, Your Honor. The parties concluded that especially given the involvement of federal and bankruptcy law issues, it was more appropriate for Judge Swain to keep the matter. She agreed, and no party appealed that decision. All right, thank you. May I just address two quick equitable mootness points? You have one minute. Okay, so the equitable mootness point I wanted to address, first of all, is the First Circuit has actually concluded in Public Service Company of New Hampshire that constitutional claims absolutely can be mooted by the doctrine of equitable mootness. The doctrine of equitable mootness clearly survives the mission case. The analogy I would make is there the court decided that substantive mootness was necessary, didn't address equitable mootness. That's like saying if a court decides Article III standing in one case, it wipes away the doctrine of prudential standing. That is obviously untrue. And the other point I would like to make is that with respect to a stay, these parties were not diligent. They were dilatory. They didn't seek a stay at any proceeding. They didn't take advantage of Pro Mesa 106 that says things should be expedited. And, in fact, between this appeal and the other, they have sought more than 15 delays in the briefing schedule. That is the opposite of what is required under the first prong of equitable mootness in order to preserve your rights. They've been dilatory rather than diligent. Thank you, Your Honors. I will go on mute. I can't video mute myself, unfortunately. Well, hold on. I just want to make sure there aren't additional questions. All right. You were pressing. So I have gotten myself off track. Mr. Bienenstock, are you up now? That's fine, Your Honor. That works. Herman Bauer would go next, and then there's one other speaker. All right. Good afternoon and good health to all. My name is Martin Bienenstock of the law firm Proskauer Rose, LLP. We are representing the Oversight Board as the Title III representative of COFINA. I had a lot of prepared remarks, but given the colloquy to the moment, I want to start with what I consider the hot issues. Your Honor, in virtually every Chapter 11 reorganization and Chapter 9 municipality case, there are some secured claims, and the same as there are in the Title III case here. The only difference here is that usually the litigants holding the secured claims do not emphasize the words Fifth Amendment and constitutionality to ring alarm bells as much as they've been raised here. They are secured claims, and the question is, what is the value? It's common ground that both the bankruptcy code sections imported into PROMESA, particularly here, Section 1129B2A, require that creditors be given the value of their collateral. The question here was, what was their collateral? Not the value. What was their collateral? When push came to shove, the Commonwealth creditors and the Commonwealth said, wait a minute, those sales and use taxes that our legislation previously said were COFINA's property are really not. That was the dispute. It was not a frivolous dispute, and I just want to quickly give you the reasons why not so you have a feeling for what people were fighting about. The Commonwealth creates the sales and use tax, collects the sales and use tax, and can repeal the sales and use tax. Yes, as one of the speakers said, the Commonwealth covenanted not to repeal it, but as the late Justice Scalia's book on statutory interpretation shows, one legislature cannot bind the next. In addition, this court, the First Circuit, has twice in its jurisprudence over, I would say, the last 25 years, once within the last perhaps 10 or 15, said that when state law says someone has title or owns property, it doesn't mean that is binding in a federal bankruptcy case. The specific examples were the owner of a liquor license was interpreted as not property, and in, I think, Maine or Massachusetts, when you take a mortgage, the lender gets a deed of title. This court said, well, the lender may look like he has title and may have it under state law, but for bankruptcy law purposes, the title remains in the debtor. Given all of the Commonwealth's control over the sales and use taxes and these other concepts I've mentioned, there was a dispute. Now, how to resolve the dispute? The PROMESA statute says the oversight board is the sole representative in Title III of each debtor, so CAFINA and the Commonwealth. The oversight board could have. It's also given the exclusive right to propose a plan. It could have simply made a few phone calls to creditors, got a sense of what would be voted for, proposed a plan. Instead, it had a lot more elaborate process. It appointed two agents, and it said to those agents, litigate this, which they did. A complaint was filed. They then filed dueling summary judgment motions, and then see if you can settle it. And the oversight board retained the right, with Judge Wayne's approval, if it didn't like what was going on, to just propose a plan on its own. Well, the two agents did come to an agreement, and then one got cold feet. So the oversight board stepped in and proposed a CAFINA plan that adopted the settlement that was reached before the cold feet. It was not required by anything in PROMESA. Confirmation requirements in PROMESA are in Section 314B. There is not one requirement that says, to confirm a plan, the court has to see that there was a mediation or a settlement process. We didn't have to talk to anybody. We could have just proposed a plan. Creditors would either accept it or reject it. In this case, to add to the fairness, not to subtract from it, there was a super-duper elaborate process using federal judges of all levels, bankruptcy court, district court, circuit court, to meet with the creditors on all sides and to try to come up with something that would have a lot of buy-in, because these were big numbers. CAFINA had approximately $18 billion of debt. And that process worked. And the appellants here today, not one of them says they asked to be in that mediation and were excluded, because they didn't. And everything that was going on is on a public, free website maintained by prime clerk. So the mediation order that allows people to ask to come in, as long as they sign a confidentiality agreement, that was public. And these are not unsophisticated appellants. Mr. Hine is of counsel at Wachtell, Lipton, Rosen, and Katz. He knows how to use the computer. He knows the law. I don't understand. Did other parties ask to come into the mediation and then participate? Yes, yes. This happened over a period of roughly a year, give or take, and there were multiple meetings. And everyone was represented by sophisticated counsel, all the big firms. This was hashed out. But that only adds to the fairness. It was never required for the fairness. So you're saying that no matter what plan you submit to us, we just have to approve it? No. Is that the bottom line of what you're saying? No. You're saying the law doesn't require any of this approval. So what are we doing here today? Judge Torello, what I'm saying is when the oversight board proposes a plan, the creditors can reject it or accept it. And what happened here is it was accepted by super overwhelming margins. And if any of the appellants had come into the room and said, we don't like it, give us more on the Coffina Jr. side, it doesn't take any imagination to know that they wouldn't have convinced the billions of dollars of debt voting to the contrary over their desires. Now, to address Judge Kayada's questions regarding, again, this constitutionality of the determination, his constitutional claim, plain and simple, was he wants the value of his collateral. He doesn't like the outcome as to what his collateral was. And he doesn't like that the bankruptcy code provisions imported into PROMESA, in this case, section 1126, says that if a class votes, and Mr. Friedman had it right, half plus one in number of creditors holding at least two-thirds of the amount that vote. If a class votes to accept, the dissenters, such as Mr. Hine, are bound. Now, to show how fair that is, even to non-bankruptcy lawyers and judges, let's look at what would happen if that were not the rule. That if every Mr. Hine could stand up after confirmation and say, well, I was in the minority, but it doesn't matter. I'm going to bring a lawsuit and prove that the settlement was bad and that the collateral was valued the wrong way. And if I win, I get all my money. That can't work, because you would never know what the settlement is. You would always be subject. The settlement would not avoid the litigation that you settled to avoid. Moreover, I want to mention to your honors the Supreme Court decision in Young v. Higbee, 324 U.S. 204. That is not in our briefs. Is that in your brief, sir? Pardon me? Is that in your brief? No, no. You have to file a 10-28-day letter or whatever. We will happily do that. Yes, thank you. The reason I'm raising it is that in that case, two preferred shareholders appealed a confirmation order, and they got a settlement. And they said, this is great. We got more than the rest of the class. And the Supreme Court said, no, it's not great. Even though the rest of the class did not appeal, you are effectively representatives of the class, and you can't take all that money for yourself. You have to share it with everyone else. So I think what you're saying, if I'm understanding correctly, I think you're saying under 1126C, Mr. Hine has in fact accepted the plan. He's a member of a class that there was a two-thirds majority of interest that accepted the plan, so he's deemed to have accepted it. Well, he is bound by the acceptance. We know that he personally did not accept. He would probably reject it. He's bound by the acceptance of the majorities. Now, the other points I wanted to make, to the extent I have more time, is on the issue of the legislation, the district court under PROMISA Title III did not need any territory legislation to discharge debt or to confirm a plan providing for the issuance of new debt. The legislation was beneficial for only one reason. By getting the imprimatur of the Puerto Rico legislature on this new debt, the market would not question it, so it would trade for a higher value. And that's why the debtors, Cofina, and the creditors all wanted that legislation, but that legislation by itself did nothing in terms of affecting appellant rights, except it gave them more value, because they did collect, as all the other junior and senior Cofina bondholders collected in this case. They collected and are collecting a hefty amount, and their bonds will trade higher, are trading higher, because the legislature blessed what the Title III court was confirming. To the extent that they argue that the legislative act of canceling the old debt violates the contract clause of the Constitution, they are grossly mistaken, and the reason they are grossly mistaken is that, number one, it was the Title III court, through the plan, that discharged and extinguished the old debt, as a function of federal law. For the appellants to come in here and say there was an impairment of contractual obligations is like walking into a church and accusing the priest of practicing religion. That is what the Title III court is supposed to do and did do, and you can't confirm a plan unless you impair debt, unless you started with enough money to pay off all the debt, which is contrary to the reason why you're in Title III in the first place. Mr. Biestock, did you participate in the negotiations that took place? Yes, I did, Your Honor. I noticed that one of the things that was agreed to was that the settlement would be determined by the law of New York. Is there any particular reason? I mean, the bonds before that all said they would be interpreted by the laws of Puerto Rico. If it was New York, Your Honor, it was because that's the way the creditors accepting the new bonds wanted it, so they could litigate basically from where they're from for the most part. And also, Your Honor, Puerto Rico... It's unusual that all this case has to do with things that happened in Puerto Rico, and yet the law of New York is going to be paramount. Now, Your Honor, when Puerto Rico, before PROMISO was even enacted, when it issued debt in 2014, the general obligation bonds it issued were governed by New York law, and that was because to sell them, they found that's what they had to provide. Okay, thank you. Judge Kayada, additional questions? No, I'll take Judge Howard. Judge Torea, no. All right, thank you, Mr. Biestock. Thank you, Your Honor. Apeliz, you may take this in whatever order you prefer, but I'm assuming Mr. Bauer is up next. Yes, Your Honor, good afternoon. You may proceed when you're ready. Thank you, Your Honor, may it please the Court. I will be addressing several of the issues in the Pinto-Lugo appeal, which is 19-1811. Your Honors, after the district court overruled the appellant's substantive objections to the proposed amended COFRINA plan of adjustment, the appellants raised two issues on appeal.  First, appellants contended that the procedures employed by the district court to confirm the amended COFRINA plan of adjustment somehow violated appellants' specified due process rights. And second, appellants further contended that the district court was required to adjudicate the merits of a separate adversary proceeding challenging the validity of the COFRINA and new bond legislations prior to approving the COFRINA plan of adjustment. The Oversight Board respectfully submits the procedural issues raised by appellants or meritless. Due process entitled appellants to adequate notice of the proposed plan, an opportunity to object to the plan, and an opportunity to be heard. Appellants do not dispute that they received notice of the proposed amended plan as per the bankruptcy and federal rules and the applicable case management order. They do not dispute that they were afforded an opportunity to submit a written objection to the proposed amended plan, that they in fact submitted a written objection to the plan, they received notice of the confirmation hearing, they were afforded an opportunity to appear and be heard at the confirmation hearing, and received a decision overruling the merits of their objections. Moreover, appellants cannot point to a single statute of bankruptcy rule that would have required the court to adjudicate their planned objections as set forth in the adversary proceedings prior to the hearing and confirmation of the amended plan. Thus, the appellants were afforded all of the process to which they were entitled prior to the district court's determination to overrule their substantive objections to the amended COFRINA plan of adjustment. Counsel, can I interrupt your argument just to ask a question that perhaps comes out of left field? Perhaps I should have asked Mr. Friedman this, but I think that your client is one of the folks who's saying that we should simply decide the Pinto-Lugo matter on equitable mootness grounds and not get into the merits. You're arguing the merits. My question is this. If we just look at whether they sat on their rights, didn't seek a stay, didn't seek an expedited appeal, it seems to me that all we would be saying in holding for your side on that basis is simply that you've got to take those two steps and then you've preserved all of your merits arguments. That doesn't seem to me to really get anybody very much. And so I'm wondering, really, shouldn't we be getting into both procedurally what they did or didn't do in terms of aggressively asserting their appellate rights or seeking a stay and the merits, which is what you're arguing now, as opposed to what we've been asked to do by several appellees, which is to stay away from the merits. Do you see what I'm getting at? Your Honor, while I'll defer to Mr. Friedman for any further color on this issue, I believe that ultimately whether or not the appellants in this case moved to stay or did not move to stay is simply one of a multiplicity of elements that must be taken into consideration in the context of equitable mootness. While I believe it is the Oversight Board's position that the appeal should be dismissed on equitable mootness grounds, we nonetheless wanted to address some of the issues that were raised by the pinto luga because we believe that the substantive issues that they raised were waived because they did not raise on appeal those specific issues. And while we're prepared to discuss them and explain to your Honor why the issues concerning the new bond legislation are a political question that should not be addressed, it's not justiciable, and there is no issue with the debt limits of the political constitution, nonetheless we believe that equitable mootness should be the basis upon which this appeal is dismissed. Okay, proceed. I'm sorry, I didn't quite understand. Are you saying there's no issue as to whether the constitutional limits on borrowing are an issue before us? At this juncture, we believe there is not, your Honor. And at what juncture did they stop being so? How's that? At what juncture do you claim they stopped being an issue before the court? Your Honor, at this juncture, the constitutional debt limit in the political constitution applies specifically to direct monetary obligations of the commonwealth. And there's an argument that COFINA, by the way it has been operating, the way it has been spending money, is basically being used by the government of Puerto Rico to run its government. Your Honor, the dispute that existed between the commonwealth of Puerto Rico and COFINA concerning not the nature of the debt, but rather the resources that were to be used to pay that debt was an issue that was ultimately settled with the commonwealth 1919 motion and the settlement. So that's why you say it got settled in the settlement? No, your Honor, I think that it's two different issues. I think that the debt limit applies when in the context of direct monetary obligations of the commonwealth. In this case, these are direct monetary obligations of COFINA. The issue of the settlement was different. The issue of the settlement, I believe, was an issue concerning who was entitled to the property, meaning the cash flow, to be used to pay that debt. So I think there's a distinction there. Was COFINA part of, or was when it existed, the government development bank? No, COFINA was a separate and distinct legal entity from the government of Puerto Rico and from the other instrumentalities, your Honor. Are you saying it was not part of the government development bank? No, your Honor, I do not believe it was. I believe it was its own separate corporation. All right, I'll drop that for the time being. Thank you. Your Honor, as I mentioned before, we do not believe that the appellants raised these substantive issues on appeal because the issues that they raised were procedural and that due process was amply complied with in the adjudication of their objections on the merits. One additional point I would like to discuss, your Honor, and it goes back to a question that was asked earlier, is in connection with the challenge made to the new bond legislation by the appellants predicated on the contention that the purported violation of a legislative rule or parliamentary decision in the House of Representatives of Puerto Rico could result in the annulment of legislation that was enacted by both the House and the Senate in Puerto Rico and was signed by the governor. Your Honor, to purportedly unwind the result of the political process simply because there is a grievance as to an internal procedural rule is something which the courts in Puerto Rico and other courts have consistently ruled that it should be a non-justiciable political question, which is why we believe that Judge Swain absolutely acted appropriately when she decided not to enter into the merits of that controversy. All right. Thank you. Additional questions by the judges? Thank you, Mr. Bauer. If you would mute. Thank you. Mr. Cooper. Yes. May it please the Court, David Cooper, on behalf of the Cofina Senior Bond, Valuable Holders Coalition, and I'll be addressing solely the equitable mootness issue. There's been a lot of discussion of the merits, but the critical point here is that if the appellants had brought a stay motion, this Court could have considered the merits as part of that stay motion before the plan was executed, before Reorganized Cofina canceled the bonds and issued $12 billion in new bonds, before those new bonds were traded hundreds of thousands of times, before there were billions of dollars in disbursements to Cofina and its bondholders. Instead, the appellants made a choice. They chose not to seek a stay in the district court or in this court and to appeal only after the plan went into effect. Now, this choice has consequences, and the consequences is that if the appellants' requested relief would be impractical and inequitable, then their claim should be declared equitably moot under this Court's precedence. There's essentially no dispute here that actually undoing the plan would be virtually impossible, and that any attempt to do so would undermine the rights of third parties as well as the Commonwealth of Puerto Rico. Let me stop you right there. If they had sought a stay and it was denied, and if they had sought an expedited appeal and were not granted that, then where are we? So, I think there are two things to point out on that. Because we have a plan that you say can't be unwound. Yes, and so our position would be in that situation that even there, their claims would be equitably moot, but certainly that would be a much harder case than this one where they made a specific choice not to seek a stay, not to seek the expedited appeal. But I'd also like to point out that that situation virtually never arises, and the reason it virtually never arises is because if the claims were actually meritorious, then if they had sought a stay, this court very likely would have granted a stay or at least an interim stay to consider their claims more fully. And so that's really the point of the equitable mootness doctrine is to ensure that people with potentially meritorious claims get a chance to present them to the court, but do it at a time when the court can consider it without undermining the rights and expectations of third parties. When was the plan approved, the date? I'm sorry, I don't have the date in front of me, but I think it was nine days from the date it was approved to the date it was implemented. And during that time, there was no objection to that time period specifically. What I'm trying to find out is at the time they started distributing funds, wasn't it known that there were still issues that hadn't been decided by a court? So it was certainly known that there were people who objected to the plan, but at that time no one had yet appealed. So no one had filed a notice of appeal. No one had filed a motion to stay either in the district court or in this court. So while it was certainly possible that someone would appeal after the implementation of the plan, there was no way to know at that point whether or not that would occur. Because the notice of appeal was filed after the plan was in fact implemented. So the real question here is what happens when they decided not to ask for a stay? And would this in fact be inequitable? And as has been discussed in this oral argument, there are provisions in the plan barring severability. That is, the appellant claims essentially you can pay off tens or hundreds  But there are provisions specifically in the plan, specifically directed to the discharge provision, saying they are not severable from the plan. We're not aware of any legal basis for setting aside those non-severability provisions. But even putting them aside for the moment, providing relief to the appellants would necessarily require unwinding the plan. And there are two things to point out on that. First is section 1123A4, which has been discussed in this argument, which requires equal treatment of classes of creditors. Now, Mr. Hine referred to this provision and said that it would not be a problem here because all of the creditors, aside from the ones he represents and potentially the other appellants here, consented under 1123A4. But what he fails to note is what they consented to, which is the plan and settlement. They did not consent to have the appellants be treated more favorably than them. And I think it's critical to look at the specific language of 1123A4, because what it says is a plan shall, quote, provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest, end quote. No one agreed, the parties who are not appealing here, the non-appellants, all of the other creditors did not agree to less favorable treatment than the appellants. And thus, there is no legal basis under the bankruptcy code for the district court to modify the plan such that the appellants and only the appellants get some benefits, get some greater recovery than other creditors in their class. So what that effectively means is that if you want to provide recovery to the appellants, that means that you also have to rewrite the plan to give greater recovery to all the other people in those class of creditors. And once you are doing that, you are rewriting the plan. You are rewriting the entire allocation of funds in the plan. You are rewriting the settlement. And once you are doing all of those things, then the plan is effectively void. And all of the transactions that have already occurred under the plan are at best suspect and seemingly void as well. And so this idea that you can simply draw out a certain amount of money, it's fiction. It has never happened. They do not cite any case where it has ever happened. And it certainly cannot happen in a case like this where there is an integral plan and settlement that the district court specifically recognized could not be undone. Once you start pulling on that thread, once you start saying the money should be allocated differently, then all of the parties can say that the money should have been allocated differently, and the plan is effectively void. And the result of that, as is virtually undisputed, would be a completely chaotic situation where literally thousands upon thousands of third parties have their rights and expectations undone, even though they acted perfectly in good faith on the validity of the plan and of the bonds that they were purchasing. Do your clients just have Cofina bonds? Our clients, we are representing a group of Cofina senior bondholders, holders of Cofina senior bonds, correct. Do they hold the general obligation bonds in addition to that also? Some of them may hold other bonds as well, yes. Well, how many clients do you represent? How many are there in this group? The group, I don't know if I have the exact number. It's in the caption. It depends on how you categorize different entities which are part of one, but yes, effectively, yes. And don't all 17 own both Cofina and general obligation bonds? I believe some of them do hold general obligation bonds. I can't attest to exactly which holds exactly which bonds, especially at this particular moment in time, but I think it's fair to say that certainly some have held general obligation bonds. Thank you. I have no questions. Why don't you take a minute and wrap up, Mr. Cooper? Sure. I just want to get to the last point I'll make is in response to Judge Howard's question about why the merit shouldn't be considered along with equitable mootness. And I think the critical point here is two things. First, under this court's precedent, equitable mootness is not something where you consider the merits as part of the equation. There are three factors that this court has outlined for equitable mootness, and the merits are not part of them. And part of the reason that the merits are not part of those factors, one is just that it's looking at whether the relief is inequitable, and so the merits simply don't answer that question. But the other, and this goes to the first factor which is pivotal here, is that the merits could have been considered, and the appellants made a choice not to have them considered at a time when it would not undermine the rights of third parties. And so to consider the merits anyway as part of the equitable mootness doctrine would undermine the very point of the doctrine, which is to encourage parties to come forward first in the first instance with the same motion so that we're not in this situation where the third party's rights would be undone. Thank you. If you could mute your device. Mr. Heim? Yes, can you hear me now? Yes. Let me just respond to some of the points that have been made. The plan was actually conditioned on the new bond legislation. No new bond legislation, no plan. We cite the record on page 44 of our reply. They have not cited any case that says that, in effect, a bankruptcy court or district court acting in bankruptcy can require a violation of the contract clause, as the new bond legislation surely did in releasing the lien. And, indeed, the PROMISA section here, 2174 sub B, sub 3, is the opposite. The court must actually find that the debtor is not prohibited by law from taking action necessary to carry out the plan, and that's referenced in our opening brief on page 47. Secondly, on the confidential mediation question, they have cited no case where what's occurred here has occurred. Bear in mind that the judge could have, for example, appointed a committee to represent all bondholders, including individuals, a committee with the duty to all bondholders, including individuals, could have done that, did not. Instead, we had self-interested parties. Everyone who participated in the confidential mediation got a benefit that, in many cases, several benefits that non-participants, individuals, did not. I filed a proof of claim. They did have a proof of claim mailing. There was nothing in that proof of claim notice about mediation. I filed a proof of claim identifying my address and e-mail. I did not receive any notice about the mediation. There's a reference to the vote mechanism. Well, the bonds were sold on the basis of the mediations were on the docket. You know, Your Honor, I've looked at those. Those are from early in the case in 2017, frankly, until getting notice of the plan of confirmation at the end of 2018. I was not reviewing the docket in the case. You know, it's not realistic to think that individual bondholders are going to be reviewing a court docket. And even if I had, a lot of this was done on a hearing transcript that was then withheld for 90 days. So from the point of view of individual bondholders, there was a simple way to provide notice. They could have sent a notice to the people who filed proofs of claims. They had the addresses. They had the e-mails. They didn't send a notice. In terms of the voting mechanism here, the bonds were sold on the basis that the Commonwealth would not alter any of one's rights and that there'd be no change in principle or interest without your consent, without the bondholder's consent. And one of our constitutional points under the Fifth Amendment is that that cannot be altered retroactively to take our property, security industrial, Radford, among other authorities we've cited in our brief. There's a reference to the Fifth Amendment being an alarm bell. I respectfully submit the Fifth Amendment to our Constitution is not an alarm bell. It's the Constitution. The district court, in saying that there was just compensation, only relied on this confidential mediation. And I'd refer to our addendum, Roman 1, page 216. The district court's opinion on 1 and 2 on that page. We've heard about non-separability. Fundamentally, one can't, through the bootstrap of providing non-separability in the plan, immunize against constitutional and statutory violations. We heard from Mr. Bienstock that one legislature cannot bind another. That may be true for the federal. And there's a reference to the Winstar case in this court's Andalusian opinion. But we're talking here about the Commonwealth, which is subject to the Contracts Clause. And it's very clear that the U.S. Trust case that we cite that the district court did not address, that this was a contract clause violation. U.S. Trust involved a statutory covenant that New Jersey and New York purported to modify. And the United States Supreme Court said even that modest modification that did not affect people's rights to payment was unconstitutional. We've cited on the takings claim point, Lynch, which the district court did not address, Ornn, Coombs, and I refer the court to our briefs. Mr. Friedman referred to Rule 9019. Well, the 9019 motion was in the Commonwealth Title III, not in the Cofina proceedings. In the Cofina proceedings, and this was clearly spelled out on the record at the outset of the confirmation hearing, was also clear, I think, from the court's own opinion, was very clear that the Cofina, whether or not this was appropriate for Cofina bondholders was for the Cofina plan. They were not required to participate in the Commonwealth 9019 motion. Fundamentally, the 9019 standards have no application here whatsoever to the Cofina bondholders. Here we're talking about constitutional and statutory rights, 9019, and whatever general law there might be about preferring settlement has no application whatsoever to abrogate our constitutional and statutory rights. Thank you. Thank you, Mr. Heine. Thank you very much, Your Honors. All right. I think that covers this case. That concludes the argument in this case.